UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GREGORY ATTERBERRY | : | CIVIL ACTION |
|     Plaintiff | : | FILE NO. 3:02CV1490(PCD) |
| v. | : | |
| | : | |
| IKON OFFICE SOLUTIONS, INC. | : | |
|     Defendant | : | OCTOBER 31, 2003 |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**I.  INTRODUCTION**

The Defendant, Ikon Office Solutions, Inc., ("IKON"), has moved for summary judgment as to the First Count of the Complaint, which alleges race and color discrimination under Title VII of the Civil Rights Act of 1964, as amended. The basis of IKON's claim as to that count is that (1) Plaintiff stole IKON equipment and sold it for his own profit; (2) he admitted to doing so; (3) Plaintiff was terminated for this criminal conduct, which also violated IKON policies; (4) a white employee was also terminated for possessing stolen IKON property; and (5) there were no similarly-situated employees treated differently than Plaintiff. (Def. Mot. p. 1.) IKON then asserts there are no material facts in dispute and claims it is therefore entitled to summary judgment as a matter of law as to the First Count. Id. The Plaintiff's claim as we demonstrate herein is that it was a common practice among similarly-situated salespersons at

x

The Defendant selectively applied these policies to the Plaintiff yet failed to discipline other non-minority employees for similar "criminal" and "dishonest" conduct. That by any explanation constitutes discrimination.

## II. FACTS

The Plaintiff began employment with the Defendant in September, 1989 when it was A-Copy. (Comp. ¶ 4.) The company name was changed to IKON Office Solutions, Inc. in 1996. The Plaintiff was promoted to the position of Major Account Representative in 1995. (Dep. Pl., p. 10.) In that position he was paid by commission based upon the volume of sales of equipment, which had been the practice since he was employed by the Defendant. The Plaintiff became one of IKON's most successful salespersons with accounts that included UConn's Athletic Department, Northeast Utilities and some of the state's largest law firms. (Dep. Pl., p. 7.) The Plaintiff was having his most successful year when he was approached in the early part of 2001 by IKON President Robert Sullivan about going to group compensation. (Dep. Pl., p. 6.) The Plaintiff rejected Sullivan's suggestion because he did not want to rely on others and felt he was good at what he did and wanted to be compensated that way. Id. The Plaintiff's resistance to Sullivan's desire to change the way compensation had always been done resulted in "heated discussions" between them, and ultimately led to Sullivan letting it be known that the Plaintiff "better come on board" with group compensation. Id. at 7.

IKON <u>before</u> and <u>during</u> his employment to engage in the same activities for which he was terminated, and despite this practice being known among IKON officials, no one was terminated until the Plaintiff was. Furthermore, all other salespersons who engaged in the practice of selling or keeping used equipment were white, and the actions of IKON in terminating the Plaintiff were racially motivated due to his extraordinary success as a salesperson for IKON.

Additionally, Defendant professes to be a company where "fraud, dishonesty and criminal conduct by IKON employees will not be tolerated." (Def. Exh. C-2.) The Defendant selectively seized upon this "policy" to convince the Court that it is a company that does not tolerate "fraud, dishonesty and criminal conduct" by its employees as its explanation for terminating the Plaintiff. Yet, during company-sponsored trips to New York for Big East Tournament basketball games and Fenway Park for Boston Red Sox games, the Plaintiff was instructed to scalp customer tickets by a Vice President of the company and told to keep quiet about it. (Dep. Pl., pp.74-75.) The company reaped the profit from this illegal activity. <u>Id.</u> Jay Singer, President of the Northeast Region of IKON and third from the top of IKON, participated in the ticket scalping to raise money to buy drinks. (Dep. Pl., p. 98.) He also used the Plaintiff's wife to cover-up for him with his wife while he participated on company time in the "dishonesty" of an affair. <u>Id.</u>

Following this disagreement over the manner in which compensation would be handled, the Plaintiff was treated differently by Sullivan. (Dep. Pl., pp. 7-9.) During meetings of the Major Accounts Team, Sullivan referred to "have-nots" and "cockroaches" while looking at the Plaintiff who was the only Black person in the room. The Plaintiff confronted Sullivan who apologized for the remark, which was racially offensive to the Plaintiff. (Dep. Pl., pp. 14-17.)

The Plaintiff was contacted in July, 2001 by the Glastonbury Police Department regarding sales of IKON equipment to the Wireless Zone. (See Police Rep. attached.) Prior to being contacted by the Glastonbury Police, Plaintiff admitted to Sullivan that he had sold used equipment to the Wireless Zone. (Comp. ¶ 10.) As a result of the police investigation of the sale of used IKON equipment, Plaintiff entered a plea of *nolo contendre* to one count of larceny. (Dep. Pl., p. 56.) Plaintiff was terminated on July 13, 2001 for selling used IKON equipment in violation of company policy, which stated "fraud, dishonesty and criminal conduct by IKON employees will not be tolerated." (Def. Exh. C-2.)

Upon promotion to Major Accounts, the Plaintiff was told by Kim Coen that "when you're in major accounts ... customers will have old equipment that they're either trading or getting rid of. That's equipment that you can keep for yourself and sell refurbished." (Dep. Pl., p. 10.) Coen was then a Major Account Representative who was later promoted to District Sales Manager. (Id. at 20.) Coen approached Plaintiff to obtain a used fax machine for her

husband's business which he provided for her. (Dep. Pl., p. 11.) Coen paid for this machine which Plaintiff obtained as a part of the practice of keeping or selling used equipment he learned from Coen. (Dep. Pl., pp. 11-13.) Coen continued to seek used equipment from Plaintiff when she became District Sales Manager. (Dep. Pl., p. 30.)

The practice of keeping or selling equipment was common among Major Account Representatives. (Dep. Pl. p. 11.) The practice had been going on for at least thirteen years before the Plaintiff became a Major Account Representative and continued during his employment. (Dep. Pl., p. 72.)

This practice of keeping or selling equipment among Major Account Representatives was known by Kim Coen. (Dep. Pl., p. 20.)

Much of the used equipment that was returned was thrown away because they had little or no value. (Dep. Pl., pp. 26-27.)

Kim Coen was aware of the practice of keeping or selling used equipment by Major Account Representatives and had participated in the practice as a representative. (Dep. Pl., p. 20.) Neither she nor any other Major Account Representative was disciplined for engaging in this practice before the Plaintiff was terminated. Donald Benjamin, a Major Account Representative, was questioned by Glastonbury Police about a copier and four copier cassettes found in his home during their investigation into stolen IKON equipment. (See Police Rep.

attached.) He at first told the police the copier was given to him when he worked at Ryan's Business Machines the year before. When told by the officer he was going to check the serial number to see if it was from IKON and it would be their option to prosecute, he changed his story and said it may have come from IKON and that he may have taken it as a "piece of equipment from a sales account." (Id. p.3.) Mr. Benjamin was questioned by Sullivan regarding this equipment and was not disciplined. According to the Plaintiff, Philip Silverstein and Donald Benjamin were involved in this practice at the same time as he. (Dep. Pl., p. 46.)

Additionally, Ralph Sagrillo and Lynanne Zyarady, both Major Account Representatives, were aware of this practice being done for over twenty years. They also attest that Kim Coen was aware of this practice. (Affs. of Sagrillo and Nyarady attached.) The attached attested letters of David Milardo and Stephen Bailey demonstrate clearly that the termination of the Plaintiff for participating in this practice was shocking. (See letters of David Milardo and Stephen Bailey attached.)

### A. IKON Supervisory Employees Participated in Illegal and Criminal Scalping and Other Dishonest Behavior in Violation of Company Policy.

As a result of Plaintiff's relationship with the UConn Athletic Department, IKON received tickets to the Big East Basketball Tournament in New York City and to Red Sox games at Fenway Park in Boston. (Dep. Pl, p. 72). These tickets were given to the company

for use with customers. Id. The UConn tickets came to IKON as a direct result of Plaintiff's relationship with the Athletic Director, Lew Perkins. (Dep. Pl., p. 73.) Robert Sullivan, the President of IKON, and Vice President Sherrie Price would have Plaintiff scalp those tickets to buy beer. (Dep. Pl., pp. 72-74.) Plaintiff was told by Ms. Price to be quiet about the scalping of tickets. (Dep. Pl., p. 76.) Ticket scalping in New York is against the law and a crime. (Dep. Pl., p. 98.) Vice President Price told the Plaintiff in Boston regarding the scalping of Red Sox tickets, "Be careful. You know, my husband's a cop. And I hope I don't have to call him. You guys be careful. But you need to scalp these." (Dep. Pl., p. 98).

On a trip to New York City Jay Singer, President of the Northeast Region of IKON and third in command at IKON, asked the Plaintiff to "cover for him" while he "went on a date" with money from scalped tickets as his wife was with the Plaintiff's wife. (Dep. Pl. p. 9.) This conduct violated IKON's policy against "fraud, dishonesty and criminal conduct." (Def. Exh. C-2.) This was done on company time and violated IKON's policy on dishonesty. (Def. Exh. C-2.)

Sherrie Price, Jay Singer and Robert Sullivan, who were white supervisory officials at IKON, violated the company's policy against "Fraud, Dishonesty and Criminal Conduct" by their involvement in scalping tickets and/or "cheating." None of them was disciplined as a result of their conduct in <u>violation of the same policy for which the Plaintiff was terminated.</u>

### III. ARGUMENT

#### A. Plaintiff Has Established a Prima Facie Case of Discrimination in His Termination.

In order to establish a prima facie case of discrimination, the Plaintiff must show that (1) he is a member of a protected class; (2) that he was qualified for the position; (3) that he was subjected to adverse employment action; and (4) that the circumstances of the adverse employment action give rise to an inference of discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Harget v. National Westminster Bank, USA, 78 F.3d 836 (2d Cir. 1996). Once the plaintiff makes out a prima facie case of discrimination, the burden shifts to the defendant to give a legitimate nondiscriminatory reason for the termination. Thereafter, the plaintiff must demonstrate that the employer's reason was a pretext for discrimination. Texas Department of Community Affairs v. Burdine, 450 US. 248 (1981). The overriding burden of persuasion remains with the Plaintiff at all times. Id. at 245.

The issue before the Court on Defendant's motion is whether the Plaintiff can present evidence that other non-minority, similarly-situated employees were treated differently than he. Tramble v. Columbia Univ., 1999 U.S. Dist. LEXIS 1274 (S.D.N.Y. 1999). Additionally, the Court can also consider evidence of remarks by decision makers that could be viewed as indicating discriminatory animus. Richetts v. Ashcroft, 2003 U.S. Dist. LEXIS 3878 (S.D.

N.Y. 2003). In this case, the Plaintiff presents evidence of (1) arguably racially-offensive comments directed toward him after he challenged the President's decision to change the way compensation for Major Account Representatives had always been done; (2) that he was terminated for engaging in a practice that was widespread and engaged in long before his involvement by similarly-situated white sales representatives; and (3) that similarly-situated white employees, including the President, engaged in criminal activities in violation of the same company policy pursuant to which the Plaintiff was terminated and received no disciplinary action.

    1. Plaintiff was terminated for engaging in a long-standing accepted practice of keeping or selling used equipment.

The Plaintiff has admitted to selling used equipment he received from customers as trade-ins once he became a Major Account Representative. He learned of this practice from Kim Coen, then a Major Account Representative who then became a District Sales Manager. (Dep. Pl., p. 20.) In fact, Coen approached the Plaintiff to purchase a used fax machine for her husband's business, who told him "... when you're in major accounts... customers will have old equipment that they're either trading in or getting rid of. That's equipment that you can keep for yourself and sell refurbished ..." Next time you run into a fax machine, let me know. My husband needs one. And I'll show you how it's done." (Dep. Pl., pp. 10-11.) Coen

admitted to purchasing a used fax machine from Plaintiff for her husband's body shop business. (Dep. Coen, pp. 37-38.)

Others involved in this practice included Philip Silverstein, Donald Benjamin, Kim Coen and Stephen Bailey. (Dep. Pl, p. 81.) Mr. Benjamin was questioned by the Glastonbury Police about a copier and four cassettes he had in his home. He at first said the copier came from Ryan's Business Machines where he previously worked, but then changed his story when told the serial numbers would be checked and if they were IKON's, he could be prosecuted. (See Police. Rep. pp. 2-3.) He then changed his story and said he may have "taken it as a piece of equipment from a sales account." Interestingly, he used words which accurately describe the practice the Defendant denies existed of taking used equipment from sales accounts. Mr. Benjamin, who is white, was not disciplined for his actions.

According to statements by David Milardo and Stephen Bailey, the practice of keeping and selling used equipment was an ongoing practice at IKON. Additionally Ralph Sagrillo and Lynanne Nyarady attest to this being an accepted practice at IKON and one of which Kim Coen was aware. Yet at the time Plaintiff was terminated, no other employee was ever disciplined during all the years of this practice. The fact that Mark Fisher was terminated does not excuse Defendant's discriminatory treatment of Plaintiff. In fact, it merely serves as a means of covering up its pretext in terminating the Plaintiff.

### 2. Racially derogatory comments by Robert Sullivan.

The Plaintiff testified that early in 2001 he was approached by President Robert Sullivan who sought his support to change the way in which commissions were paid to Major Account Representatives. (Dep. Pl. p. 6.) Sullivan wanted to change to a group compensation payment on commissions from the traditional "eat what you kill" method that had been the way it was done by Defendant since Plaintiff began employment there. Plaintiff was having his most successful year to date having earned $127,000 after about five months of 2001. (Dep. Pl. p. 6.) The Plaintiff was vocally opposed to Sullivan's desired change, which was followed by his first "heated discussions" he ever had with Sullivan. Id. Prior to that time Plaintiff and Sullivan were "pretty close" and things changed thereafter. (Dep. Pl. p. 7.) At a sales meeting during this time, Sullivan used the term "cockroaches," referring to selfish salesmen who "go for themselves." (Dep. Pl. p. 8.) The Plaintiff was offended by this reference and confronted Sullivan about that remark and another referring to "haves and have-nots." The Plaintiff being the only Black person in these meetings felt offended by these racially insensitive remarks and so informed Sullivan who issued an apology. (Dep. Pl. pp. 8-9.) These remarks were made days before the Plaintiff was terminated. Id.

These remarks and their timing leading up to the termination are evidence of discriminatory animus. Richetts v. Ashcroft, supra. While Defendant may question the racial

overtones of these remarks, the use of the term "cockroaches" carries a stereotype regarding living conditions among minority groups. (Dep. Pl. p. 19.)

    3. The President and other decision makers violated the same policy pursuant to which Plaintiff was terminated and received no disciplinary action.

The Defendant claims to be a company where "fraud, dishonesty and criminal conduct" by employees "<u>will</u> <u>not</u> <u>be</u> <u>tolerated</u>." (Def. Exh. C-2.) The Plaintiff was terminated for violating this policy by selling used IKON equipment. Despite the Defendant's claim to be a company that would not tolerate behavior such as that for which the Plaintiff was terminated, the President, Vice President and the President of the Northeast Region of IKON knowingly participated in scalping tickets in violation of criminal laws. Ironically, it was through the Plaintiff's contacts that tickets to Big East Tournaments and Red Sox games were given to IKON President Sullivan. Vice President Sherrie Price would have these tickets scalped in order to buy beer. (Dep. Pl. 72, 74.) The Plaintiff did not drink beer or any other alcohol at that time. Price's husband was a policeman and she warned Plaintiff to be careful so she would not have to call him to help out. (Dep. Pl. p. 98.) Additionally, Singer, President of the Northeast Region of IKON and who was third in command, had the Plaintiff "cover" for him as he "went on a date" with another woman in New York while his wife was with Plaintiff and his wife <u>Id.</u>

PLAINTIFF

By: _____
Joseph A. Moniz (ct04316)
Moniz, Cooper & McCann, LLP
100 Allyn Street
Hartford, CT 06103
Tel. (860) 278-0200
His Attorneys

## CERTIFICATION

THIS IS TO CERTIFY that a copy of the foregoing was mailed, postage prepaid, this date to:

Michael G. Petrie, Esq.
Jackson Lewis LLP
55 Farmington Avenue
Suite 1200
Hartford, CT 06105

_____
Joseph A. Moniz