UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

Gregory ATTERBERRY,
    Plaintiff,

v.     : Civ. No. 3:02cv1490(PCD)

IKON OFFICE SOLUTIONS, INC.,
    Defendant.

### RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MOTION FOR ENTRY OF DEFAULT[1]

Defendant moves for summary judgment as to Count One of Plaintiff's complaint pursuant to FED. R. CIV. P. 56(b), and for entry of default on all counterclaims or summary judgment pursuant to FED. R. CIV. P. 55 and 56. For the reasons stated herein, Defendant's motions are **granted**.

### I. Background[2]

Beginning in approximately 1995, Plaintiff worked as a Major Account Representative for Defendant. Defendant's "Compensation Plan for Equipment Sales" for Fiscal Year 2001 (the "2001 Plan"), which became effective in October 2000 and was updated in February 2001, applied to Plaintiff's employment. Pursuant to the 2001 Plan, Plaintiff was required to receive and process traded-in or end-of-lease-returned equipment, which was to be reflected on the new equipment invoice as a credit and returned to Defendant's inventory.

---

[1] Although Defendant titles its motion as a motion for default judgment, the motion is construed as a motion for entry of default, as default must be entered before default judgment can be rendered.

[2] The facts are taken from the parties' Local Rule 56(a) statements, and are undisputed unless stated otherwise.

The "Equipment Returns/Trade-Ins" provision of the 2001 Plan provides that "[a]ll trade ins become the property of IKON and *must be returned* to the local warehouse facility. Any payoffs associated with the trade-in *must be included* with the new order and *proper paperwork must be turned in* with the deal" (emphasis added). Defendant's "Trade-In Integrity" provision of the 2001 Plan provides that "all equipment traded in by a customer *must be returned* to IKON's warehouse. Any [Sales] Rep[resentative] that re-sells a trade-in and does not report it through IKON's required paperwork *will be terminated for unethical business behavior, which constitutes gross misconduct*" (emphasis added). All employees were required to follow Defendant's Code of Ethics. Plaintiff signed a receipt confirming that he received a copy of the Code of Ethics and was familiar with its provisions.

Defendant's "Conflict of Interest" provision provides that "employees must conduct themselves in a manner that avoids conflicts of interest and that upholds IKON's business reputation." Defendant's "Protection of IKON's Assets and Resources" provision states that "IKON employees must protect IKON's assets and resources" and that "[i]llegal or improper use of such assets and resources is prohibited." Defendant's "Fraud, Dishonesty and Criminal Conduct" provision states that "fraud, dishonesty, and criminal conduct by IKON employees will not be tolerated." Defendant's Code of Ethics also provides that "IKON employees are expected to comply fully with all federal and state laws and with IKON's internal policies."

On or about July 2, 2001, Wireless Zone (located in Colchester Connecticut) contacted Defendant about some equipment. Robert Sullivan, President of Defendant's Hartford Marketplace, investigated the call and discovered that Wireless Zone was not a

2

current customer. That same day John Brophy, Vice President of Financial Operations for Defendant, visited the Wireless Zone store. Although Plaintiff denies Defendant's allegation that Brophy obtained serial numbers from several pieces of Defendant's equipment at the store, he admits that a check of the serial numbers obtained by Brophy revealed that one of the copy machines was listed as lost from Defendant's inventory. Consequently, Sullivan and Brophy visited other Wireless Zone store locations and collected serial numbers from equipment. Upon investigating these serial numbers, they discovered that some of the equipment was listed in Defendant's inventory records as lost, stolen, or belonging to another IKON customer.

Defendant had no record of Plaintiff selling equipment to Wireless Zone and never received any proceeds from these sales. On approximately July 13, 2001, Plaintiff admitted that he had taken used IKON equipment and sold it in violation of IKON policy. Sullivan filed a report with the Glastonbury Police Department (the "Police"), requesting that they investigate the thefts, return the stolen equipment, and "pursue criminal charges against the persons responsible." The Police inspected the Wireless Zone stores, finding at least four stolen IKON copiers and fascimile machines, and one other machine believed stolen because the serial number was removed. The Police interviewed the owner of Wireless Zone, Scott Gladstone, who told them in a sworn statement that "over the past approximately three years I have purchased Canon Copier and Fax Machines from an IKON representative named . . .

3

Gregory Atterbury [sic]." Gladstone provided the Police with copies of checks made payable to Plaintiff.[3]

When questioned by the Police on August 1, 2001, Plaintiff provided a sworn statement, providing that

> When I'm taking new deals, if there is a trade in piece of gear (fax or copier) we would, including myself, give the customer the trade-in discount with the new piece of gear, but not acknowledge that used gear they were trading in on the new order. Thus, keeping the used piece of gear for our personal use or sale . . . I realize that IKON policy was to put the used gear on the invoices of the new equipment I was selling to any customer and then turned the used gear (copiers, fax machines, etc.) back to the company. The company, IKON, would then decide what to do with it. I was aware of this company policy prior to engaging in this practice of selling used gear to others and keeping the money.

During the Police investigation Plaintiff identified several other IKON employees whom he alleged engaged in this practice. Sullivan requested that "the investigation [] continue and IKON employees who may have committed crimes, arrested." The Police investigated each IKON employee identified by Plaintiff, including questioning some of their family members. On or about August 9, 2001, the Police inspected the home of a former IKON employee, Mark Fisher, and discovered three pieces of IKON equipment believed to be stolen. Sullivan later met with Fisher, who is white, and terminated his employee based on his improper possession of the IKON equipment.

The Police investigation concluded that, other than Plaintiff, "no other IKON sales representatives have been caught [stealing and] selling IKON copiers and fax machines to outside businesses." Based on both the Police investigation and its own internal

---

[3] Plaintiff denies Defendant's contention that the checks were drawn on Wireless Zone's checking account.

4

investigation, Defendant concluded that only Plaintiff stole and sold IKON equipment for his own profit. Although no criminal conduct was proven regarding Fisher, he was terminated because his conduct violated Defendant's policy. No evidence was found that any other employee identified by Plaintiff possessed stolen equipment, stole or sold IKON equipment for its own profit, and consequently none of these other employees were terminated. When asked if he was "aware that the police of IKON was aware and had evidence that someone took equipment and sold it for their own profit," Plaintiff testified "I don't know." During his deposition, Plaintiff did not dispute that he stole IKON equipment, and did not dispute that he was aware at the time he was violating IKON policy. Plaintiff also admitted that he was aware that he would be terminated if he violated such policy. Plaintiff testified that he had stolen IKON supplies, including toner cartridges and drums, selling those as well.

Plaintiff filed a six count complaint, alleging a violation of Title VII of the Civil Rights Act of 1964 (Count One); violation of the Connecticut Unfair Practices Act (Count Two); Negligent and Intentional Infliction of Emotional Distress (Counts Three and Four); False Arrest (Count Five); and Slander (Count Six). In February, 2003, this Court granted Defendant's motion to dismiss Counts Two through Six [*see* Doc. No. 18]. Plaintiff seeks compensatory damages, punitive damages, costs and expenses, reasonable attorneys' fees, and any other relief the Court deems appropriate.

## II.   Defendant's Motion for Summary Judgment

### A.   Standard

A party moving for summary judgment must establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. FED. R. CIV.

5

P. 56 (c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "A party opposing a properly brought motion for summary judgment bears the burden of going beyond the pleadings, and 'designating specific facts showing that there is a genuine issue for trial.'" *Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). In determining whether a genuine issue has been raised, all ambiguities are resolved and all reasonable inferences are drawn against the moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962); *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980). Summary judgment is proper when reasonable minds could not differ as to the import of evidence. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991). "Conclusory allegations will not suffice to create a genuine issue." *Delaware & H. R. Co. v. Conrail*, 902 F.2d 174, 178 (2d Cir. 1990). Determinations as to the weight to accord evidence or credibility assessments of witnesses are improper on a motion for summary judgment as such are within the sole province of the jury. *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

**B.  Discussion**

In order to establish a prima facie case of employment discrimination pursuant to Title VII, a plaintiff must show (1) membership in a protected class; (2) adequate performance in a position or qualification for a potential promotion; (3) adverse action taken against plaintiff, and (4) the adverse action occurred under circumstances giving rise to a reasonable inference of discrimination. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000). The burden on plaintiff to establish a prima facie case is minimal.

After plaintiff establishes a prima facie case, the burden shifts to defendant to provide a legitimate reason for acting as it did. *See id.* Once such a reason is provided, the burden returns to plaintiff to establish by preponderance of the evidence that such reason was in fact a pretext for discrimination. *See id.* "For the case to continue, the plaintiff must then come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination. The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Id.* (quotation omitted).

    1.    **Prima Facie Case**

Plaintiff argues conclusorily that he has established a prima facie case of discrimination. Pl. Opp. at 8. Defendant does not dispute the first three elements of Plaintiff's prima facie case, disputing only whether the circumstances of Plaintiff's termination give rise to an inference of discrimination. Def. Mem. in Supp. of Summ. J. at 16.

To prove the fourth element of a prima facie case, "[a] plaintiff may raise [] an inference [of discrimination] by showing that the employer . . . treated him less favorably than a similarly situated employee outside his protected group." *Graham v. Long Island Rail Road*, 230 F.3d 34, 38 (2d Cir. 2000). "A plaintiff may support an inference of race discrimination by demonstrating that similarly situated employees of a different race were treated more favorably." *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999). The comparable employees must be similarly situated "in all material respects,"

7

which means that "a plaintiff must show that her co-employees were subject to the same performance evaluation and discipline standards . . . [and] that similarly situated employees who went undisciplined engaged in comparable conduct." *Id.* at 40 (internal quotations and citations omitted). While the burden of making out a prima facie case is slight, "the issue of whether fellow employees are similarly situated is somewhat strict." *Wang v. N.Y.C. Dept. of Finance*, No. 96-CV-5170, 1999 U.S. Dist. LEXIS 11256, at *45 (E.D.N.Y. July 21, 1999). Thus, merely analogizing is inappropriate and employees must be shown to have "reported to the same supervisor as the plaintiff, . . . been subject to the same standards governing performance evaluation and discipline, and must have engaged in similar conduct . . . without differentiating or mitigating circumstances. . . ." *Id.* "[A] company-wide policy uniformly applicable to all members of a group may be a basis for comparing employees, regardless of particular job being performed," and "the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." *Graham v. Long Island Rail Road*, 230 F.3d 34, 39, 42 (2d Cir. 2000).

Defendant contends that the only other IKON employee arguably similarly situated to Plaintiff, Fisher, was also terminated for his misconduct, that no other employees were similarly situated to Plaintiff, and that consequently Plaintiff's termination for theft and sale of Defendant's equipment fails to create an inference of discrimination. Def. Mem. in Supp. of Summ. J. at 18. Plaintiff contends that various other IKON employees, including Kim Coen (a Major Account Representative later promoted to District Sales Manager), Donald Benjamin (Major Account Representative), and Philip Silverstein were involved in the same

8

practice as Plaintiff yet they were not terminated. Pl. Opp. at 5-6. Plaintiff also alleges that Ralph Sagrillo and Lynanne Nyarady (Major Account Representatives) were aware of this practice. Pl. Opp. at 6. He provides letters from David Milardo and Stephen Bailey which reflect their belief that terminating Plaintiff was "shocking." Pl. Opp. at 6. Moreover, he alleges that IKON Supervisory Employees violated Defendant's policies by participating in illegal and dishonest behavior, including ticket scalping and affairs, and he contends that Sullivan made various comments evincing discriminatory animus.

### a. Threshold Issue of Admissibility of Plaintiff's Evidence – Statements of Milardo and Bailey

Plaintiff relies on an undated, unaddressed, unsigned, and unsworn letter from David Milardo (an IKON employee) and an unsworn letter from Stephen Bailey (a service technician). Pl. Opp. Exh. Absent any indication that an affidavit or letter is "sworn . . . [or] that it is declaration made under penalties of perjury sufficient to be considered as evidence in opposition to a motion for summary judgment," the affidavit or letter must be stricken. *United States v. All Right, Title and Interest in Real Property and Appurtenances*, 77 F.3d 648, 657-58 (2d Cir. 1996), *cert. denied*, 117 S. Ct. 67 (1996).

Accordingly, the letters from Milardo and Bailey are stricken and do not provide any basis to deny summary judgment.[4]

---

[4] Even if these documents were considered, they provide no details but only sweeping conclusory generalizations. For example, Milardo states that "most of the service rep[resentatives] . . . have knowledge of many salespeople over the years doing the same thing [Plaintiff] was fired for." He fails to identify the time and identity of these "many" people, and does not allege that these unnamed individuals acted pursuant to a policy of Defendant's. Bailey's letter is equally effuse and unavailing. He vaguely and uncommittingly states that
> [m]ost trade-in equipment generally has very little value put on it so it probably isn't accounted for by the company as carefully as it could be. I would not be surprised if many current tenured sales representatives and a few of their managers are aware that this has been going on for years as well.

9

### b. Similarly Situated Employees

#### i. Fisher

Defendant argues that the only other employee who was arguably similarly situated to Plaintiff, Mark Fisher (a white employee not in Plaintiff's protected class), was terminated when Defendant learned he possessed stolen IKON equipment. Pl. Mem. at 22-23. At his deposition, Plaintiff admitted that Fisher was treated the same as him during the investigation. Atterberry Dep. at 34. In his memorandum opposing summary judgment, Plaintiff contends in conclusory fashion that Fisher's termination "merely serves as a means of covering up [Defendant's] pretext in terminating" Plaintiff. Pl. Opp. at 10. This bare allegation, which contradicts Plaintiff's deposition testimony, is insufficient to withstand a motion for summary judgment. *See Henry v. Daytop Village, Inc.*, 42 F.3d 89, 97 (2d Cir. 1994) (finding that for a selective enforcement claim to reach a jury, the plaintiff must adduce evidence of more than mere conclusory or unsubstantiated statements). Like Plaintiff, Fisher was terminated when Defendant concluded that he possessed stolen equipment (even though, unlike Plaintiff, there was no evidence that Fisher sold the equipment for personal profit). Fisher, not in Plaintiff's protected class, engaged in conduct sufficiently comparable to Plaintiff, and was investigated and terminated. Therefore Plaintiff's termination does not give rise to an inference of discrimination.

#### ii. Coen

Plaintiff argues that he learned the practice of reselling used equipment for personal

---

The fact that he "would not be surprised" if unidentified managers were aware of something that "probably" has occurred by unidentified sales representatives does not raise a genuine issue of material fact.

10

profit from Kim Coen, then a Major Account Representative who became a District Sales Manager. Pl. Opp. at 9. Defendant contends that Coen is not similarly situated to Plaintiff as Plaintiff does not produce any evidence to demonstrate that she retained and sold IKON property for personal profit or that IKON management knew of her alleged conduct and failed to investigate. Def. Reply at 5. Moreover, during their investigation the police searched the business of Coen's husband. Def. Mem. in Supp. of Summ. J. at 12. They found two pieces of office equipment, but Mr. Coen produced canceled checks and records indicating that the items had been legitimately purchased from IKON, and IKON's inventory records did not indicate that these items were lost inventory or stolen. Def. Mem. in Supp. of Summ. J. at 12. There was no basis to find that Coen had stolen and sold IKON equipment for personal profit.[5] Plaintiff has failed to establish that Coen was similarly situated.

### iii. Silverstein, Benjamin, and Bailey

Plaintiff argues that "[o]thers involved in this practice included Philip Silverstein, Donald Benjamin, . . . and Stephen Bailey." Pl. Opp. at 10. He only provides a specific argument about Benjamin.

Plaintiff alleges that during the police investigation, Benjamin admitted that he may have taken an IKON copy machine that was found in his home. Pl. Opp. at 10. He argues

---

[5] Although Plaintiff argues that Coen had participated in the widespread practice of stealing and reselling IKON equipment, as noted the police and internal investigations did not result in evidence incriminating Coen. While Plaintiff contends that Coen was never disciplined, he produces no evidence that her superiors were aware of her alleged wrongful activities. Plaintiff's reliance on affidavits of Ralph Sagrillo and Lynane Nyarady (both Major Accounts Representatives) does not bolster his argument. Their statements that they were both aware of this practice and that Plaintiff did not start it do not raise a genuine issue of material fact that Plaintiff was treated differently than similarly situated employees. Neither Sagrillo nor Nyarady alleges that Sullivan was aware of this practice. "It is impossible to demonstrate that [Defendant] treated similarly situated [employees] differently when there is no evidence that [Defendant] knew about other violations" of its policies. *Shumway v. UPS*, 118 F.3d 60, 64-65 (2d Cir. 1997).

11

that Benjamin, "who is white, was not disciplined for his actions." Pl. Opp. at 10. Defendant contends that according to IKON's inventory records, the copy machine found at Benjamin's home was not listed in IKON's inventory and was not found to be stolen property. Def. Mem. in Supp. of Summ. J. at 12. Plaintiff thus provides no basis to find that Benjamin stole and sold IKON equipment for personal profit.

Nor is there evidence to establish that Silverstein was similarly situated. The police search of Silverstein's home yielded no IKON equipment. Silverstein told the police that he might have had a print board somewhere in his garage. Def. Mem. in Supp. of Summ. J. at 11. His sworn statement attests that he believed that any such print board was an extra he kept available for an existing IKON customer. *Id.* The police searched Silverstein's father's business and found no evidence of stolen IKON equipment. *Id.* Plaintiff provides no basis to find that Silverstein stole and sold IKON equipment for personal profit and thus does not establish that Silverstein was similarly situated.

As discussed above, Bailey's unsworn letter is stricken, and even if considered merely states vague conclusory generalizations. Moreover, Bailey does not concede that he engaged in conduct similar to Plaintiff's.

### iv. IKON Supervisory Employees

Plaintiff argues that numerous IKON employees violated its company policies and were not terminated. Pursuant to his relationship with the University of Connecticut Athletic Department Athletic Director Lew Perkins, Plaintiff was given tickets to the Big East Basketball Tournament in New York City and to Boston Red Sox games at Fenway Park in Boston. Pl. Opp. at 6-7. Plaintiff alleges that Defendant's President Robert Sullivan and

Vice President Sherrie Price directed him to scalp the tickets so they could use the profits to purchase beer, which violated New York laws. Pl. Opp. at 7, 12-13. He alleges that a regional President of IKON violated the policy against dishonesty by engaging in an extra-marital date on company time. Pl. Opp. at 7. He argues that these individuals "violat[ed] the same policy for which Plaintiff was terminated" but were not disciplined. Pl. Opp. at 7.

However, while these others may have violated the same general policy, Plaintiff fails to demonstrate that these violations were similar in all material respects and that the conduct was of comparable seriousness. He has not offered evidence that these individuals stole IKON office products and resold them for personal profit. He cites no legal authority supporting his proposition that they engaged in illegal activity by selling tickets. Although he alleges that they violated the company's policy regarding "fraud, dishonesty and criminal conduct" and general ethics he does not allege that they violated the numerous other company policies he was cited for violating, including the "Equipment Return/Trade-Ins" provision, the "Trade-In Integrity" provision, the "Conflict of Interest" provision, and the "Protection of IKON's Assets and Resources" provision. He has not presented evidence that these individuals were in a sufficiently similar position and were treated more leniently. *See Jenkins v. Area Coop. Educ. Servs.*, 248 F. Supp. 2d 117, 127 (D. Conn. 2003).

### c. Alleged Statements Evincing Discriminatory Animus

Plaintiff argues that racially derogatory comments by Sullivan are sufficient to support an inference of discrimination. Pl. Opp. at 11. He alleges that his difference of opinion with Sullivan regarding compensation structure disrupted his previously "close" relationship with him. Pl. Opp. at 11. While Sullivan was advocating group compensation,

13

Plaintiff "rejected Sullivan's suggestion because he did not want to rely on others" for his compensation. Pl. Opp. at 3. Plaintiff states that at a sales meeting "days before" his termination, Sullivan "used the term 'cockroaches,' referring to selfish salesmen who 'go for themselves,'" and that he "felt offended by these racially insensitive comments." Pl. Opp. at 11.

"The circumstances that give rise to an inference of discriminatory motive include actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus. . . . [and] the timing or sequence of events leading to the plaintiff's termination." *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996).

Pointing to Plaintiff's own statements, Defendant contends that Sullivan's statements were not racially motivated. At his deposition, Plaintiff stated that

> . . . I can remember being in a major account meeting when [Sullivan] was bringing it to MASSIS, which is a major account team, he made a comment in the group–and it was to the group, I'll be clear on this. But he did make a comment that we need to stop being cockroaches. That we should be ants. And I immediately raised my hand and wanted to know why he referred to us as cockroaches. And he said the analogy was that cockroaches are selfish and they go for themselves. Ants all stick together and carry a piece of bread or loaf that's for the entire group. . . . Shortly after that we have a regional meeting. And every month you are singled out for either making plan or not [making] plan. This particular month Mr. Sullivan had the people that made plan, of which I was not, stand up. And the people that did not make plan sit down. And he said, "These are the haves, and the have-nots." And being the only black in there, I took offense to that.

Pl. Dep. at 8-9. Plaintiff himself admits that the statements were made to the entire group, although he alleges that he felt singled out because Sullivan looked at him while speaking. Pl. Opp. at 4. Although Plaintiff contends that the term "cockroaches" carries negative racial connotations, he does not cite any authority to support his proposition. In the context of the meeting, Sullivan was contrasting individual and group goals. The fact that Plaintiff

14

personally felt offended does not in itself escalate the word "cockroach" or the phrase "haves and have-nots" as evidence of racial animus. *See Williams v. County of Westchester*, 171 F.3d 98, 101 (2d Cir. 1999) (subjective feelings of discomfort are insufficient to make out a claim of a racially discriminatory environment). On its face, the word cockroach is race neutral. *See* OXFORD ENGLISH DICTIONARY (defining cockroach as "a well-known large dark-brown beetle-like insect, commonly called black-beetle, nocturnal in habits, and very voracious, infesting kitchens, etc., in large numbers"). Likewise, on its face the phrase "haves and have-nots" is race neutral. *See id.* (defining "have" (n.) as "one belonging to the wealthier class"). Plaintiff has not presented sufficient evidence that Sullivan's cockroach comment could reasonably be interpreted as indicating a belief that certain IKON salespersons were cockroaches because they were black, as opposed to a belief that they were analogous to cockroaches rather than ants because they favored individual-based compensation over group-based compensation. He has not offered sufficient evidence that Sullivan's "have and have-nots" comment could be reasonably interpreted as a racial slur, as opposed to commenting on who had or had not met their compensation goals. *See Evans v. Nine West Group, Inc.*, NO. 00-4850, 2002 U.S. Dist. LEXIS 6427, at *20-*22 (E.D.Pa. Apr. 15, 2002). " The very fact that . . . an African American is insulted does not render that statement actionable; put simply, there is a significant doctrinal difference between insulting a black person and insulting a black person because she is black or on the basis of some race-specific characteristic." *Id.* at *22.

Moreover, the two alleged statements are not bolstered by any other evidence of racial animus. *See Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir. 2000) (evidence of

one stray comment by itself is usually not sufficient proof to show discrimination); *Campbell v. Alliance Nat'l Inc.*, 107 F. Supp. 2d 234, 247 (S.D.N.Y. 2000) (finding isolated, stray remark insufficient to establish racial animus and defeat a motion for summary judgment). Furthermore, although Plaintiff claims that Sullivan was motivated by race animus, he alleges that earlier the two were "pretty close" prior to the compensation disagreement, Pl. Opp. at 11, which does not support and indeed contradicts an inference of discrimination. *See e.g. Grady v. Affiliated Central, Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) (in the context of hiring and firing, "when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire"). Here, an invidious motivation would be inconsistent with Sullivan's earlier affinity towards Plaintiff.

Plaintiff fails to raise a genuine issue of material fact that Sullivan's comments were motivated by racially discriminatory animus. Accordingly, as Plaintiff fails to demonstrate that he was terminated under circumstances giving rise to an inference of discrimination, Defendant is entitled to summary judgment.

### 2. Defendant's Asserted Nondiscriminatory Reason and Plaintiff's Assertion of Pretext

Even if Plaintiff had established a prima facie case, however, Defendant would still be entitled to summary judgment. As indicated above, once Plaintiff has set forth a prima facie case, the burden shifts to Defendant to provide a non-discriminatory reason for the adverse employment decision. Defendant asserts that it terminated Plaintiff because he stole IKON equipment and sold it for personal profit, as Plaintiff concedes he did.

Having offered a nondiscriminatory reason for the discharge, the burden shifts back to Plaintiff to show that the nondiscriminatory reasons offered by Defendant are merely a pretext for discrimination. *See id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-10, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)). Without providing any further analysis or discussion, Plaintiff conclusorily alleges that "[t]he fact that Mark Fisher was terminated . . . . merely serves as a means of covering up [Defendant's] pretext in terminating Plaintiff." Pl. Opp. at 10. He has not offered any evidence from which a reasonable juror could conclude that Defendant's stated reasons for terminating him were pretextual. When the police became involved in the matter Sullivan instructed them to investigate anyone in possession of stolen property, which does not reasonably support an inference that Sullivan selectively targeted Plaintiff because of his race. "Conclusory allegations will not suffice to create a genuine issue." *Delaware & H. R. Co. v. Conrail*, 902 F.2d 174, 178 (2d Cir. 1990). After Defendant carries the burden of "articulating some legitimate nondiscriminatory reasons for the employee's rejection . . . the plaintiff must . . . prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination." *See Texas Dep't of Cmty. Affairs. v. Burdine*, 450 U.S. 248, 252-53, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981); *Meiri v. Dacon*, 759 F.2d 989, 989 (2d Cir. 1985) (conclusory allegations of discrimination are insufficient to prevent summary judgment); *Karen Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996) (dismissing Title VII claim premised on the ground that employer showed valid, unrebutted reasons for plaintiff's termination, and plaintiff offered nothing but conclusory allegations as regarding defendant's actions); *Smith v. American Express Co.*, 853 F.2d 151, 154-55 (2d Cir. 1988)

17

(conclusory and unsupported allegations insufficient to show employer's justifications to be a pretext for discrimination).

Plaintiff is entitled to rely on the evidence comprising his prima facie case as evidence of pretext. *See Reeves*, 530 U.S. at 142 ("The trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual") (citations and internal quotation marks omitted). However, Plaintiff is not entitled to survive summary judgment simply by setting forth a prima facie case. *Jenkins*, 248 F. Supp. 2d at 129 (citing *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 103 (2d Cir. 2001) ("Evidence of pretext, however, even combined with the minimal showing necessary to establish a prima facie case . . . does not mandate a denial of summary judgment")). At this stage

> the Court must examine the entire record to determine if [Plaintiff] meets [his] ultimate burden of persuading the fact-finder of a central element of a . . . claim; namely, that [Defendant] intentionally discriminated against [him] on the basis of [his] race . . . Whether summary judgment is appropriate here depends upon 'the strength of [Plaintiff's] prima facie case, the probative value of the proof that [Defendant's] explanation is false, and any other evidence' that supports [Defendant's] case.

*Id.* (citing *Reeves*, 530 U.S. at 148-49). Here, after considering the strength of Plaintiff's prima facie case, Defendant's explanation, and any other evidence supporting Defendant's case, Defendant is entitled to summary judgment, as the record does not support an inference that Plaintiff was intentionally discriminated against on the basis of race. *See Jenkins*, 248 F. Supp. 2d at 129.

### III. Defendant's Motion for Entry of Default

Defendant moves for default on all of its counterclaims, arguing that pursuant to FED. R. CIV. P. 6 and 12(a)(2), Plaintiff was required to serve a reply to Defendant's counterclaims within 20 days after service of Defendant's answer. Def. Mem. in Supp. of Summ. J. at 28. Plaintiff's deadline to serve such reply was April 18, 2003, and to date Plaintiff has not replied. Moreover, Plaintiff does not address this issue in its reply memorandum, and accordingly Defendant's motion for default on all of its counterclaims is **granted** absent opposition. Defendant shall, on or before January 9, 2004, move for judgment on the default pursuant to FED. R. CIV. P. 55(b). Should Defendant not make such motion, its counterclaims will be dismissed for failure to prosecute. FED. R. CIV. P. 41.

### IV. Conclusion

For the reasons stated herein, Defendant's motion for summary judgment on Count One [Doc. No. 33] is **granted**, and Defendant's motion for entry of default on all counterclaims [Doc. No. 33] is **granted**.

SO ORDERED.

Dated at New Haven, Connecticut, December 9, 2003.

Peter C. Dorsey
Senior United States District Judge